199 N.J. Super. 212 (1985)
488 A.2d 1083
CHRISTOPHER COYLE, PLAINTIFF-APPELLANT,
v.
ENGLANDER'S, PAUL DUJETS AND WE TWO, INC., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted November 13, 1984.
Decided March 5, 1985.
*213 Before Judges KING, DEIGHAN and BILDER.
*214 Ball, Hayden, Kiernan & Livingston, attorneys for plaintiff-appellant (Stuart S. Ball, on the brief).
Fink and Rosner, attorneys for defendants-respondents (Maria Tsitsiragos, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
This case presents the question of whether a disappointed promisee may recover traditional tort damages for his personal injuries caused by a breaching promisor's failure to perform a contractual term. Plaintiff Christopher Coyle claims that he sustained personal injuries on December 21, 1980 in Hillside, Union County while moving band equipment onto a truck after an evening performance by a band which he owned and managed. Coyle claims that defendants had agreed by written contract to provide help to put the band's equipment back on the truck after the performance. Coyle contends that if defendants had performed the contract as promised he would not have suffered personal injuries and his consequent money damages. Defendants claim that if there was a breach Coyle was at best limited to traditional expectation damages for breach of contract, i.e., loss of the benefit of the bargain, and may not recover the usual measure of damages in a tort action, a lump sum for temporary and permanent disability, pain and suffering, and out-of-pocket expenses. Theobold v. Angelos, 40 N.J. 295, 304 (1963). Summary judgment went to defendants at the Law Division level.
The facts are a bit sketchy because we have only portions of the depositions and the certifications of the parties are not detailed. At the time of the accident at 1 a.m. on Sunday, December 21, 1980 plaintiff was the manager, but not a member, of a band called SVT. The band had a contract to play at defendant "Englander's", a club in Hillside, on that Saturday night. "Englander's" was a trade name for We Two, Inc. of which defendant Paul Dujets was the principal.
*215 The contract was a printed form with a four-page typed "SVT Contract Rider" attached. According to plaintiff's certification a person named Michael Gaimon represented SVT in the negotiation and execution of the contract. The contract was actually signed by the drummer, Paul Zahl, one of the three SVT musicians. In the preamble to the contract SVT is referred to as "producer"; the "purchaser" is not identified. At the signature line where "purchaser" is to sign, we find the name "Paul Dujets." In plaintiff Coyle's certification he says that Dujets never said that he was acting for his corporate principal, We Two, Inc.[1] Coyle assumed that Dujets was the owner of "Englander's" and that "I was dealing with Paul Dujets, the individual."
The contract price for the performance was $450 plus 70% of any additional gross, up to $950. Admission was $5.50 a head. The potential gross with a capacity house of 200 was $1,100.
Of importance to this dispute is Clause Eight of the typed rider which said

*216 8. Crew

4 stagehands (at least 2 must help load in) from load in to the end of SVT soundcheck.
4 stagehands 1/2 hour prior to end of performance until SVT's truck doors are closed.
Coyle contends that the contract as negotiated and executed required that defendants' stagehands were "to provide help to `load-in' and `load-out' equipment before and after the performance." Dujets evidently agreed with this interpretation because on deposition he said that "I'm supposed to supply help moving equipment."
There seems little doubt from plaintiff's allegations that defendants failed to supply the help contemplated by the contract. Coyle said in his deposition that as manager it was not his job to load equipment. Around 1 a.m. on December 21 Coyle asked Dujets for help. Dujets told Coyle to talk to the "sound man." Coyle did so but was told by the "sound man" that loading equipment was not "his job" either. Coyle did get some help but he said "basically nobody was helping us, but the sound man could have helped us a little bit, but I don't remember. I don't recall off hand, but their attitude was, you know, `Do it yourself'."
The members of the band left the club after their performance, leaving plaintiff and the equipment. Before he was hurt, plaintiff was near the truck either rolling or positioning by himself an item of equipment weighing about 80 pounds as someone approached to assist him. It was "misty that night and there was like a new layer of ice that was laid down" in the street area where plaintiff was laboring. At this time plaintiff slipped on the snow and ice on the street, fell and allegedly was hurt.
In the complaint plaintiff claimed that defendants breached the term of the contract to provide adequate labor to move the equipment after the performance. Because of this failure plaintiff claims that he had to move the equipment himself and was hurt. Count One demanded damages for breach of contract; Count Two demanded damages for common-law negligence. *217 Defendants denied Dujets' individual responsibility, claimed that the snow and ice was the sole proximate cause, and that the plaintiff's negligence alone caused the accident. Summary judgment was granted to defendants. The judge's reason for the ruling was somewhat obscure. Apparently, he thought a breach of a term of the contract, if proved, did not permit recovery for the personal injuries and consequent damages suffered by plaintiff.
We perceive plaintiff's theory here solely as a claim that breach of a contractual term caused personal injuries to him. He claimed in the complaint that defendants "violated the contract agreement ... by failing to supply adequate labor for the moving of certain items of equipment, necessitating plaintiff to attempt to move certain equipment and causing plaintiff to fall and be seriously injured." The second count of the complaint alleged a traditional theory of common-law tort liability for negligent maintenance of the premises proximately causing personal injuries. But as we construe this claim as presented in the Law Division, plaintiff made no effort to establish a common-law theory of tort liability for breach of duty to a business invitee. See Butler v. Acme Markets, Inc., 89 N.J. 270 (1982); Bates v. Valley Fair Enterprises, Inc., 86 N.J. Super. 1 (App.Div. 1964) (duty of reasonable care to invitees to keep business property free of ice and snow). He relied on the contract, the breach, and his fall in the street causing injuries as a consequence of that breach. In his appellate brief plaintiff claims that the defendants "promised to supply four stagehands to move band equipment from the Club Englander's to the band's truck following the performance" and that the breach of this "clear duty" was the proximate cause of plaintiff's injuries. We thus treat this solely as a claim for breach of contract causing personal injuries, not as a breach of the common-law duty of due care owed a business invitee.
There is confusion among the cases and texts on the boundary between a contract action and a tort action. The consequences of the difference can be substantial. The recently *218 published Prosser and Keeton, Law of Torts § 92 at 655 (5th ed. 1984), states in discussing "Tort and Contract Obligations as Between Parties to a Contract"
The distinction between tort and contract liability, as between parties to a contract, has become an increasingly difficult distinction to make. It would not be possible to reconcile the results of all cases. The availability of both kinds of liability for precisely the same kind of harm has brought about confusion and unnecessary complexity. It is to be hoped that eventually the availability of both theories  tort and contract  for the same kind of loss with different requirements both for the claimant's prima facie case and the defendant's affirmative defenses will be reduced in order to simplify the law and reduce the costs of litigation.
Tort obligations are in general obligations that are imposed by law  apart from and independent of promises made and therefore apart from the manifested intention of the parties  to avoid injury to others.
Naturally, for the purpose of this case, the obligation to provide stagehands to reload the band's equipment arose from the contract, not from the common law.
Prosser and Keeton observe that failure to perform a contract does not appear to create responsibility for classic tort damages.
5. There is no tort liability for nonfeasance, i.e., for failing to do what one has promised to do in the absence of a duty to act apart from the promise made. In most situations, where a party to a bargaining transaction renders a service or sells a product, there would have been no duty to render that service or sell a product except for the voluntary undertaking to do so. That being so, the contract or bargaining transaction normally defines the scope of the obligation that the service provides or the product supplier undertakes. There is a fundamental difference between doing something that causes physical harm and failing to do something that would have prevented harm or if one prefers a fundamental difference between lack of performance of something that would have prevented harm and defective performance that caused harm either from a dangerous force or a dangerous condition of something. [Id. § 92 at 657; emphasis in original].
Prosser and Keeton, in discussing "Early History  The Distinction Between Misfeasance and Nonfeasance", says
The line of division which developed quite early was that between "nonfeasance," which meant not doing the thing at all, and "misfeasance," which meant doing it improperly. Much scorn has been poured on the distinction, but it does draw a valid line between the complete non-performance of a promise, which in the ordinary case is a breach of contract only, and a defective performance, which may also be a matter of tort. In general, the courts have adhered to the line thus drawn; and a failure even to begin or attempt performance of an *219 agreement to lend money, to employ the plaintiff, to furnish transportation, to deliver goods ordered, to furnish light for a room, to obtain the dissolution of an injunction and permit the plaintiff to proceed with the construction of a road, or to attend as a physician, all are held to amount to mere breaches of contract, for which no tort action will lie. [Id. § 92 at 659-660; footnotes omitted].
While the contract for the band's personal services had been undertaken and almost fully performed, we are basically still faced with an allegation of nonfeasance in not helping to load. If one of the stagehands had negligently dropped an 80-pound amplifier on plaintiff's foot or plaintiff had slipped on an icy area on the defendants' business premises, tort law would control and we would not be confronted with this unusual problem. But plaintiff's claim rests solely on the failure to perform a term of the contract, not on carelessly performing the contract, or on violation of any legally-imposed notion of due care.
Generally, a tort remedy is more advantageous to the injured plaintiff because greater damages can be recovered. Id. § 92 at 665. In contract actions there is ordinarily no recovery for punitive damages and pain and suffering. Ibid. There are also distinctions between the theories of actions as to statute of limitations, notions of legal causation, and limitation of liability. Latitude has been substantial, but as Prosser and Keeton notes "when the claim is one for personal injury, the decision usually has been that the gravamen of the action is the misconduct and the damage, and that is essentially one of tort, which the plaintiff cannot alter by his pleading." Id. § 92 at 666-667.
Our conclusion here is that plaintiff's claim is a tort claim for personal injuries but that the cause of action finds its source only in the contract term to provide stagehands to reload the band's equipment. We find no authority in our Supreme Court's cases to support that theory of recovery. If a privately created duty, here to help load a van, is to create a cause of action for personal injury, we conclude that this new cause of action should be created by the Supreme Court, not by an *220 intermediate appellate court. Compare, Kelly v. Gwinnel, 96 N.J. 538 (1984), reversing 190 N.J. Super. 320 (App.Div. 1983), which established a new cause of action against a social host for negligently serving intoxicating beverages to a guest with Namm v. Charles E. Frosst & Co., 178 N.J. Super. 19, 35 (App.Div. 1981), DES "market share" and "enterprise liability" claim denied. The latter issue has remained unresolved after the Supreme Court's recent consideration, Solomon v. Eli Lilly & Co., 98 N.J. 58, 61 (1984).
This State adheres to the rule of Hadley v. Baxendale, 9 Ex. 341, 156 Eng.Rep. 145 (1854), "that the defendant is not chargeable for loss that he did not have reason to foresee as a probable result of the breach when the contract was made." Donovan v. Bachstadt, 91 N.J. 434, 444 (1982). Corbin points out that to impose liability the defendant must have had reason to foresee the injury at the time the contract was made, not at the time of the breach. 5 Corbin, Contracts (1964), § 1008 at 73-74. However, the "rule requires only reason to foresee, not actual foresight." Id. § 1009 at 77.
All that is necessary, in order to charge the defendant with a particular loss, is that it is one that ordinarily follows the breach of such a contract in the usual course of events, or that reasonable men in the position of the parties would have foreseen as a probable result of breach. [Id. § 1010 at 79].
The plaintiff need only demonstrate that the damage was a type that "a prudent man would have realized to be a probable result of his breach"; the plaintiff need not establish that the defendant had reason to foresee the specific injury that occurred. Id. § 1012 at 88.
Two recent opinions of our court demonstrate that a breaching party can be liable for damages far in excess of the value of the contract. In Sandvik, Inc. v. Statewide Sec. Systems, 192 N.J. Super. 272 (App.Div. 1983), certif. den. 96 N.J. 296 (1984), defendant, a security guard service, contracted to provide guards for plaintiff's manufacturing plant. Someone bribed *221 one of the guards and stole $118,000 of the product manufactured by plaintiff. We upheld the trial court's holding that defendant was liable for breach of contract.[2] However, we reversed the Law Division judge's holding that defendant was liable only for the contract's fee for services paid during the month when the theft occurred. The motion judge had reasoned that "because defendant had not been fully informed as to the value of the tungsten carbide powder being guarded the parties could not reasonably have intended that defendant's liability for loss resulting from breach of contract should extend to the value of stolen inventory." Id. at 277. We held that such damages were recoverable because the "only purpose of the contract was to avoid the precise loss suffered" and that the damage was therefore "a reasonably foreseeable, natural and proximate consequence of defendant's breach." Id. at 278.
In Paris of Wayne v. Richard A. Hajjar Agency, 174 N.J. Super. 310 (App.Div.), certif. den. 85 N.J. 454 (1980), defendant, a real estate broker, acted as plaintiff's agent in obtaining rental property which plaintiff intended to use to manufacture clothing. Unknown to plaintiff and defendant, clothing manufacture was not a permitted use. Plaintiff's production was halted and it was unable to complete its contracts. Plaintiff had paid defendant a $300 broker's fee. It sought and was awarded damages in excess of $58,000 representing the income lost as a result of its inability to complete the contracts. On appeal defendant argued "that the loss of income from interruption of manufacturing was not a proper element of damages because it was not within the fair contemplation of the parties at the time the brokerage contract was consummated." Defendant contended that it had not been informed about the substantial *222 orders and their imminent delivery dates. We upheld the damage award, reasoning that it would not offend the rule of Hadley v. Baxendale to award damages for the lost income because, while the broker "could not foresee the specific nature and quantity of damage to plaintiff," he could "foresee that if the anticipated clothing manufacturing operation stopped because of illegality, the stoppage could cause general disruption of plaintiff's business operations." Id. at 319.[3] Both cases involved consequential damages of an economic nature, not personal injuries. We have been unable to find any New Jersey case discussing whether traditional personal injury cause of action damages can be recovered for breach of contract under the Hadley v. Baxendale foreseeability test. Indeed, we have found very little authority anywhere.
A somewhat analogous Indiana case holds that personal injury damages may be recovered in a contract action. In Strong v. Commercial Carpet Co., Inc., 163 Ind. App. 145, 322 N.E.2d 387, 324 N.E.2d 834 (Ct.App:1975), defendant contracted to install carpeting in plaintiffs' home. Defendant ran out of carpeting before the job was done and said that it would take several days to obtain the additional carpeting. The installers then left, without covering or removing a metal tacking-strip nailed to the floor. One of the plaintiffs tripped over the exposed strip and sustained back injuries.
The trial judge granted defendant's motion for judgment on plaintiffs' breach of contract claim. Plaintiffs' negligence action went to the jury, which returned a verdict for defendant. The appellate court reversed the trial judge's dismissal of the contract claim. It rejected defendant's argument that plaintiffs *223 could recover only under a negligence theory. It held that plaintiffs were entitled to assert both theories and that they had established a prima facie case of the essential elements of a cause of action for a breach of contract: a valid contract, defective performance by the defendant, and resulting damages. 322 N.E.2d at 391. It held that it was for the jury to decide, under the rule of Hadley v. Baxendale, "whether the injury suffered was a natural and proximate result of Commercial's breach which can fairly be said to have been within the contemplation of the parties at the time the contract was entered." Id. 322 N.E.2d at 392. This Indiana case differs from the case before us. The defendant had started the job and left a foreseeably dangerous condition behind. Here the promisor breached his duty to help unload but did not create a physically dangerous condition on the premises during the course of its commercial activity. Moreover, the ultimate holding of the Indiana court was that plaintiff could proceed to the jury on both a tort and contract theory. The reversal for a new trial of the contract theory, where plaintiff had gone to the jury and lost on the tort theory, raises difficulties of duplicative actions, inconsistent verdicts, collateral estoppel, res judicata and the "single controversy" doctrine.
The misfeasance-nonfeasance distinction, noted by Prosser and Keeton, generally seems to be in retreat. The Restatement of Torts sets forth in general terms when failure to perform a contract may be a tort. Section 323 states
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
(a) his failure to exercise such care increases the risk of such harm, or
(b) the harm is suffered because of the other's reliance upon the undertaking.
[Restatement, Torts 2d (1965), § 323 at 135].
This section is followed by this caveat
The Institute expresses no opinion as to whether:

*224 (1) the making of a contract, or a gratuitous promise, without in anyway entering upon performance, is a sufficient undertaking to result in liability under the rule stated in this Section, ...
The rule is substantially the same when the injured person is not an actual party to the contract.
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
(a) his failure to exercise reasonable care increases the risk of such harm, or
(b) he has undertaken to perform a duty owed by the other to the third person, or
(c) the harm is suffered because of reliance of the other or the third person upon the undertaking. [Id. § 324A at 142].
Once again the American Law Institute expressed no opinion on whether "the making of a contract or a gratuitous promise, without in any way entering upon performance, is a sufficient undertaking to result in liability under the rule stated in this Section." Caveat to § 324A at 142.
The misfeasance-nonfeasance distinction has been subject to criticism in this State as being "little more than a totally illogical remnant of the privity doctrine." Miller v. Muscarelle, 67 N.J. Super. 305, 327 (App.Div. 1961) (Conford, P.J.A.D.). Yet there may be some situations in which nonperformance, even though a breach of contract, would preclude tort liability. In Gold Mills, Inc. v. Orbit Processing Corp., 121 N.J. Super. 370, 374-375 (Law Div. 1972), plaintiff Gold Mills delivered goods to defendant Orbit. Orbit had hired a detective agency to guard Orbit's premises. Plaintiff's goods were stolen, allegedly as a result of the detective agency's employees' failure to exercise due care to place themselves in a position to observe trucks entering and leaving the premises. The plaintiff sued the detective agency which moved for summary judgment "on the legal theory that its only duty was to its contracting party, Orbit, and that neither duty nor liability exists in favor *225 of Gold Mills, a stranger to the contract." 121 N.J. Super. at 372.
Judge Larner denied the detective agency's motion. Citing Miller's rejection of the misfeasance-nonfeasance distinction, he held that since "the privity rule is no longer viable in the area of tort liability there is no reason why a contractor should not have the same duties toward a stranger to the contract as any member of society to another, i.e., to exercise due care to avoid injury to another's person or property." Id. at 376. But he noted that nonperformance alone might still not permit a negligence action.
The caveat, however, is that such liability does not attach where the contractor has failed to commence performance. Such an exception has a basis in logic and reason. Unless he has embarked on performance, he is remote from the ambit of activity which spawns the negligence underlying the cause of action. Under such circumstances his sole dereliction arises from a total failure to perform the contract  a dereliction which stems purely from his contractual undertaking rather than from a duty to other members of society beyond that contract. To permit liability to third parties for total failure to perform a contract would in effect create a new class of beneficiaries entitled to sue for breach of contract rather than for breach of a duty arising out of tort concepts. To expand contract liability to that extent would be fraught with untold new liability potentials not as yet recognized in current developments of law. [121 N.J. Super. at 376].
These same considerations may apply whether or not the injured person is a party to the contract.
Liability may be tested by the general standard of whether "performance or default thereof by reasonable foreseeability creates a risk of harm extending to the situation of the plaintiff." Miller, supra, 67 N.J. Super. at 328. This is essentially a duty question. Virtually any event is foreseeable, yet the law as a matter of public policy will impose no duty, and hence no liability, for highly unlikely, extraordinary or remote occurrences. See Caputzal v. The Lindsay Co., 48 N.J. 69, 74-79 (1966).
Referring back to the language of the Restatement, should defendants have recognized that their obligation to supply help for moving the equipment was "necessary for the protection" *226 of plaintiff; did defendants exercise reasonable care in performing their contractual promise; did the failure to exercise such care increase the risk of harm to plaintiff, did plaintiff suffer harm because he relied on defendants' contractual promise or simply because of the adverse weather? Restatement, Torts 2d, supra, §§ 323, 324A. The key element seems to be reliance:
There is no essential reason why the breach of a promise which has induced reliance and so caused harm should not be actionable in tort. This is true particularly where the harm is physical harm, to the person, land, or chattels of the plaintiff. The technicalities to which the courts have resorted in finding some commencement of performance indicate a development of the law toward such liability. In the absence of sufficient decisions, however, the question is left open.
We recognize that notions of misfeasance, nonfeasance and the technisms of privity are largely anachronisms. We also recognize that questions of insurance coverage will surely arise where a claimant's theory of recovery is based on "liability assumed by the insured under a contract or agreement" and not on liability imposed by operation of law. See The Ohio Cas. Ins. Co. v. Flanigan, 44 N.J. 504, 520-521 (1965); N.Y. & N.B. Co. v. Mass. Bond. & Ins. Co., 67 N.J. Super. 401 (Law Div. 1961); 6B Appleman, Insurance, § 4330 at 499 (1979) (liability assumed by contract); see also Weedo v. Stone-E-Brick, Inc., 81 N.J. 233 (1979). We can fairly assume that most liability insurance policies do not provide coverage for contractually assumed risks.
In the absence of precedent, or at least clear direction by dictum from our Supreme Court, we conclude that failure to perform a contractual term alone does not create liability for damages for personal injuries, where no breach of any common-law duty is implicated in the slightest, and we affirm. Development of policy is for the Supreme Court in this instance, as in most instances.
Affirmed.
NOTES
[1] There are some interesting provisions in the printed form contract which the parties do not urge upon us as controlling. The contract says it is to be construed in accordance with the laws of California and any dispute "shall be settled by arbitration in Los Angeles, California."

The typed rider is more relevant. It provides for example, in Clause Seven for
7. Refreshments
Following soundcheck: Light meal for two (crew). One must be vegetarian, possibly salad, fruit and cheese spread.
30 minutes before first set: (well iced)
1 case bottled beer (preferably Heinekin) 2 six packs Dr. Pepper 1 six pack bottled mineral water (Perrier/Calistoga) 1/2 gallon orange juice
During set in dressing room:
1 meat, cheese and fruit tray for 10 replenish drinks
For Load out: Hot Coffee
[2] In so doing, the court rejected defendant's argument that it should not be liable because the bribed employee acted outside of his employment on the ground that this contention "confuses an agency principle applicable to tort cases with the elements of contractual liability." Id., 192 N.J. Super. at 276-277.
[3] We also indicated that the same result was justifiable under tort principles, reasoning that the law had long recognized that a real estate broker who breaches a professional duty to a client can also be chargeable with negligence. 174 N.J. Super. at 317-318.